Argued June 5, reversed July 24, 1968

MORRIS ET AL, *Respondents, v.* STARK ET UX, *Appellants.*

444 P. 2d 27.

*Asa L. Lewelling,* Salem, argued the cause and filed a brief for appellants.

*Raymond J. Conboy,* Portland, argued the cause for respondents. With him on the brief were Pozzi, Levin & Wilson, Portland, and T. R. Adams, Lincoln City.

Before PERRY, Chief Justice, and McALLISTER, O'CONNELL, DENECKE and RODMAN, Justices.

O'CONNELL, J.

This is a suit in equity brought by the sole heir of Clyde M. Morris and by his administrator to set aside a deed and a bill of sale executed by Morris shortly before his death naming defendant, Ben G. Stark, as grantee. The trial court set aside the deed and bill of sale on the ground that there was not a valid delivery.

Clyde Morris was an elderly unmarried farmer who lived alone on a 267-acre ranch which he owned. The defendants, who were close friends of Morris, paid visits to him at the ranch and occasionally helped him with the farm work.

Morris was hospitalized for surgery during which time defendants lived on the ranch and managed it. On the first day he was in the hospital he sent for Mrs. Mary Geil, a relative, who was an experienced legal secretary and with her help he prepared a deed naming defendant Ben G. Stark grantee. The execution of the deed was acknowledged before a notary public. He also prepared a bill of sale covering farm equipment, tools, several trucks, livestock, etc., and a "Statement of Facts re Easement" describing an easement appurtenant to the ranch.[1] The three instru-

---

[1] The statement reads as follows:

"Statement of Fact re easement thru section 12-9-11 W to my original homestead 06504 from said homested (sic) to state highway. On Oct. 20, 1921 I laid out a road by using a team, sled & drag saw intersecting said highway at boundary monument # P 228 U.S. Geo. survey located on aforesaid highway and was assisted by W. M. Morris, Gust Sied and Roy Sied. The user on said way has been uninterrupted, continuous and without any interference. That I have expended over $300.00 cash on said way and maintained & kept said way useable thereby creating an easement in my favor. Also I have a right of way by implied grant due to land purchases from Lincon (sic) Co Log Co who owned all the land crossed

ments were enclosed in an envelope. He sealed the envelope, placed a postage stamp on it, and addressed it to Ben G. Stark, Kernville, Oregon, which is a post office near the Morris ranch. Stark testified that Morris sent for him and handed him the sealed envelope saying, "Here's the bill of sale and deed, Ben. If I don't get over this its all yours."

Stark testified that he returned to the Morris ranch and placed the envelope on a table in the dining room together with some mail addressed to Morris. Morris underwent surgery, apparently for cancer, and soon thereafter he was released from the hospital. Stark picked him up and took him to the Stark home where they stayed overnight. The next morning defendants and Morris proceeded on to the Morris ranch. According to Mrs. Stark, as Morris was going through the mail which had been left on the dining room table he came upon the envelope containing the instruments in question and addressing Mrs. Stark, said, " 'Well, this belongs to Ben. I gave it to him.' " Morris placed the envelope back on the table unopened. He went on to say, " 'I have cancer, I'm all done, I am never going to do another day's work.' " As they continued their conversation he said, " 'For a couple thousand dollars you can put water, lights and bathroom in. It's a fine place for the grandsons [of the Starks]; they can hunt and fish or have horses.' " Morris ate dinner and retired for the night. The following morning Mr. Stark discovered Morris lying outside the house with the top of his head blown off by a shotgun, an apparent suicide.

Melvin Hale, Stark's son-in-law, testified that some-

by said way which produced a double termini. The present way is on same original route.

"Feb 19—1965    Clyde M. Morris

"(542-42.7288 SS #)"

time after Morris handed the envelope to Stark, Morris said that he wasn't going to get well and that he had given a deed to Ben Stark. Hale testified that one of the reasons Morris gave for doing so was that "he felt Ben was going to make sure that things were carried out the way he wanted them." Morris referred to a recent flood which had brought logs and other debris onto the property and, according to Hale, said that "Ben would have some work to get that straightened up." Hale further testified concerning his conversation with Morris, as follows:

"* * * I had talked to the secretaries and the doctors there at the hospital and they all knew he was going to die. It was just a matter of time and so I didn't no (sic) quite what to say, so I made the statement: 'Well, you're going to get well, everything will be fine now for a while,' and he said, 'no,' definitely he was through; it was Ben's—and the ranch was Ben's problem now. He wasn't going to go back to it and ever take charge of anything any more."

Ben Stark's son testified that Morris had stated that he didn't want the ranch anymore. Maxin Alf, a friend of Ben Stark's son, testified that in a conversation with Morris at the hospital Morris had said, " 'Ben's got a farm whether he wants it or not.' " Alf's wife testified that she heard Morris make substantially the same statement.

There was evidence indicating that Morris did not want his property to go to his relatives. Mrs. Anna Rasmussen, who was the cousin of Clyde Morris' brother, Warren Spencer Morris, testified that during a conversation with Clyde in the hospital he mentioned that Lee Morris, the wife of his nephew Frank Morris, had been writing to him about twice a week. Mrs. Rasmussen said, "Well, maybe some people think

you have money, Clyde, and he said, 'Well, it won't do her any good,' the Morrises would never get his property."

Mrs. Stark testified that Clyde Morris was "quite bitter against his folks, and that is what he always said, that that was one thing they never was going to touch his property." When she was asked, "Who was that?" Mrs. Stark said, "Well, his brother in particular," referring to plaintiff, Warren Morris.

On the other hand, there was some evidence that Clyde Morris and his nephew Frank were on friendly terms. Ben Stark testified that just prior to the time Clyde went to the hospital, Stark asked him who was going to take care of the Morris ranch and Clyde said that "he was going to get his nephew and his wife to take care of it, but he wanted me [Stark] to oversee it." As we have related above, Stark took care of the ranch himself without help from Frank Morris.

We hold that there was an effective delivery which operated to pass to Ben Stark the title to both the real and personal property described in the deed and the bill of sale.

We need not decide whether the handing of the deed to Ben Stark at the hospital constituted an effective delivery. The grantor's subsequent statements and conduct were sufficient to manifest an intention to pass the title to Ben Stark. That intention was sufficiently manifested on the evening prior to the grantor's death when, in referring to the envelope containing the deed and bill of sale, he told Mrs. Stark that "this belongs to Ben. I gave it to him." If this episode were viewed alone, there might be some question as to the sufficiency of the evidence of delivery. But when taken together with the other circumstances reflecting upon

the grantor's intention to make a disposition of his property we think that proof of delivery was made out.

At the time Morris stated that the envelope "belongs to Ben" it is quite apparent that he knew that he was not going to get well. It also seems likely that at that time he had decided to take his own life.[⑨] Thus it appears that if there was a condition which Morris had previously attached to the transfer of title when he handed the envelope to the grantee, that condition was no longer in his mind on the eve of his death.

Morris' intention to make Ben Stark the object of his bounty was established by clear and convincing evidence. The proof of his intent did not rest solely upon the testimony of the grantee, his family and friends. Mrs. Rasmussen, grantor's own kin, made it quite clear that he did not intend to dispose of his property to his own relatives. By his other statements and conduct he demonstrated his affectionate ties with the Starks and his desire to make Ben Stark beneficiary of his estate.

In this type of case the credibility of the grantee and those who stand to benefit by a transfer of title becomes exceedingly important. And on appeal we frequently defer to the trial judge on the ground that he is in a better position to test the credibility of such witnesses. As we have pointed out, the proof in the present case does not rest entirely upon the testimony of interested parties. Moreover, we feel that the manner in which the Starks answered the questions put to them on the stand reflects favorably upon their credibility. If they were of a mind to fabricate, there were numerous questions put to them which gave them the opportunity to answer in a manner favorable to

---

[⑨] There is evidence that Morris, in discussing the pain he was suffering, had on previous occasions said, "When I get enough of it I will take a gun and end it all."

their cause, but they did not take advantage of that opportunity, and in some instances they volunteered statements of their understanding of the transaction which could be regarded as weakening their own case.

From our de novo appraisal of the whole record we have concluded that an effective delivery was made which operated to transfer the title to the property described in the deed and in the bill of sale.

The decree of the trial court is reversed.